IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GREGORY A. DAY, SR., | CASE NO. 5:22-cv-1706 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Gregory Day Sr. filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2020, Day filed an application for Disability Insurance Benefits alleging a disability onset date of June 6, 2020,[1] and claiming he was disabled due to back injury, COPD, depression, arthritis, and carpal tunnel syndrome.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Tr. 158, 170. The Social Security Administration denied Day's application and his motion for reconsideration. Tr. 48, 58. Day then requested a hearing before an Administrative Law Judge (ALJ). Tr. 155.

In May 2021, an ALJ held a hearing. Tr. 28–50. In July 2021, the ALJ issued a written decision finding that Day was not disabled. Tr. 15–24. The ALJ's decision became final on July 26, 2022, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

In his Complaint filed on September 22, 2022, Day asserts the following assignment of error:

> The RFC is not supported by substantial evidence as Plaintiff's allegations were not properly considered.

Doc. 10, at 3.

**Evidence**

*1.    Personal and vocational evidence*

Day was born in 1976 and was 44 years old on his alleged disability onset date. Tr. 23. He completed eleventh grade. Tr. 171. He worked as a tire warehouse manager from 2007 to 2019 and at the loading dock at a retail store from 2019 to June 2020. Tr. 34–35, 171.

*2.    Medical evidence[2]*

In September 2018, Day had a pain management appointment for lower back pain made worse with movement. Tr. 377. Day's prescriptions included

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Neurontin (gabapentin), Percocet, and diclofenac. Tr. 377, 379. Upon exam, Day had tenderness in his thoracic spine. Tr. 380. In his lumbar spine, Day had pain with movement and a limited range of motion. Tr. 380. The provider's impression was that Day had a lumbar strain, lower back pain, and leg pain. Tr. 380. The provider refilled Day's Percocet prescription. Tr. 381.

In June 2019, Day saw Louis J. DeMicco, D.O., for an evaluation of lower back pain. Tr. 386. Day said that he injured his back at work in 2012—he was stacking tires and felt a "pop" in his lower back. Tr. 386. At that time, Day had a lumber MRI, which showed a disc herniation at L5-S1.[3] Tr. 386. In the past, he had injections, physical therapy, and took Percocet and gabapentin for back and leg pain. Tr. 386. Day said that he was "recently weaned off the Percocet" and still took Robaxin, gabapentin, and diclofenac for pain. Tr. 386. Day's lumber exam findings showed that Day had pain in his lower lumbar spine and decreased strength. Tr. 386. Day had a decreased range of motion—he could flex to 40 degrees and extend to 15 degrees before feeling pain. Tr. 386. He had decreased reflexes in his legs. Tr. 386. Dr. DeMicco's impression was that Day had a lumbar sprain and L5-S1 disc displacement. Tr. 387. Dr. DeMicco wrote

---

[3]      Vertebrae in a person's spine are given letter and number designations according to their location. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited May 12, 2023). The five in the lower spine—the lumbar spine— are L1 through L5. Id. And the five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited May 12, 2023).

that he would try to obtain the report from Day's 2018 lumbar MRI and submit a form for approval referring Day to Dr. Mikhail in pain management. Tr. 387.

In July 2019, Day returned to Dr. DeMicco. Tr. 338. Dr. DeMicco wrote that Day had a herniated disc at L5-S1 and that Day was approved for pain management with Dr. Mikhail. Tr. 338. Dr. DeMicco's exam showed that Day had pain on palpation of his lumbar muscles and sacroiliac joints and pain with flexion and extension. Tr. 338. Day had decreased reflexes in his legs. Tr. 338. Day was to see Dr. Mikhail and return to Dr. DeMicco in a month. Tr. 338.

In early August 2019, Day saw pain management physician Emad Mikhail, M.D. Tr. 263. Day reported lower back pain radiating to his legs and numbness and tingling in his legs. Tr. 263. Day rated his pain an eight out of ten and described it as pressured, sharp, and tight. Tr. 263. He reported that he couldn't ride in a car, sit in a chair for several hours, walk a few blocks, reach up to high shelves, run a block, or bend over to clean a bathtub. Tr. 263. He said that it was very difficult to sleep through the night. Tr. 263.

Dr. Mikhail observed that Day had an antalgic gait.[4] Tr. 267. Day's lumbar spine exam showed that Day had mild accentuation of the normal lordosis.[5] Tr. 267. He had moderate tenderness at L4 and L5 and in his paraspinal muscles. Tr. 267. He had moderate lower back pain with extension,

---

[4]  An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, 33rd Edition, 2020, at 96.

[5]  Lordosis is an increased curvature of the lumbar vertebral column. *See* Dorland's, *supra*, at 1060.

moderate sacral pain, moderate gluteal pain, and posterolateral hip pain. Tr. 267. Day had radicular pain and dysesthesias[6] in his legs in an L5 distribution. Tr. 267. He had mild pain with lateral lower back flexion and moderate tenderness in his hips. Tr. 267. Day had iliopsoas strength of "+4/5" on the right and "+2/5" on the left; adductor strength of "+4/5" on the right and "+3/5" on the left; and quadricep femoris strength of "+4/5" on the right and "3/5" on the left. Tr. 267. Day had positive straight leg raise testing bilaterally[7] when sitting and lying down, sciatic notch tenderness on the right and left, and a positive lumbar hyperextension test. Tr. 267. Dr. Mikhail assessed Day with "other intervertebral disc displacement, lumbosacral region." Tr. 268. He advised Day to continue his current treatment plan, including home exercises, and increase his activity. Tr. 328. Dr. Mikhail wrote that Day was to receive a lumbar L5-S1 epidural steroid injection. T 268.

In mid-August 2019, Day followed up with Dr. DeMicco. Tr. 337. Day said that Dr. Mikhail scheduled a lumbar steroid injection for late August. Tr. 337. Day reported that he was a mechanic. Tr. 337. He was working in a garage warehouse and that was harder on his back than changing tires. Tr. 337. Dr. DeMicco's lumber exam findings showed that Day had pain across his lumbar

---

[6]     Dysesthesias is a distorted sensation or "unpleasant abnormal sensation produced by normal stimuli." *See* Dorland's, *supra*, at 570.

[7]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's, *supra*, at 1871. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id.*

muscles and "some spasm." Tr. 337. He had limited range of motion, with flexion to 40 degrees and extension to 15 degrees. Tr. 337. He had decreased reflexes in his legs. Tr. 337. Dr. DeMicco refilled Day's diclofenac prescription. T 337. Ten days later, Dr. Mikhail provided Day with an epidural lumbar steroid injection. Tr. 328.

In September 2019, Day told Dr. DeMicco that the injection improved his pain for about a week and then wore off. Tr. 325. Day's exam findings were about the same as Day's prior visit. Tr. 325.

In October 2019, Day told Dr. DeMicco that he quit his job as a mechanic because he couldn't perform the work anymore due to back pain. Tr. 324. Day and Dr. DeMicco discussed physical therapy and massage therapy. Tr. 324. Dr. DeMicco wrote, "at this point in time, he just wants to be treated conservatively." Tr. 324. Day had a new job working in the produce department at Walmart. Tr. 324. Upon exam, Day had a flattening of his lumbar curve, pain with flexion and extension, and decreased reflexes in his legs. T 324. Dr. DeMicco's impression was lumbar disc displacement at L5-S1 and "sprain lumbar region." Tr. 324. Dr. DeMicco continued Day's medications. Tr. 324.

In November 2019, Day saw Dr. DeMicco and rated his pain a six out of ten. Tr. 317. Day was still working at Walmart. Tr. 317. He stated that he lost his insurance, couldn't pay for his medications, and hadn't gotten his last prescription filled. Tr. 317. Dr. DeMicco's exam showed that Day had pain across his lumbar spine and sacroiliac joints and limited lumbar range of

motion, with flexion to 40 degrees and extension to 15 degrees. Tr. 317. He had "guarding with straight leg raising test bilaterally at 40 degrees of hip flexion." Tr. 317. Dr. DeMicco prescribed Robaxin, gabapentin, and diclofenac and recommended that Day follow a home stretching program. Tr. 317.

In December 2019, Day saw Dr. DeMicco and reported pain and stiffness in his lower back. Tr. 316. Day had to stand for long periods of time while working at Walmart. Tr. 316. Dr. DeMicco's lumbar exam showed that Day had a flattening of the lumbar curve and "some spasm" in his lumbar muscles. Tr. 316. He had limited range of motion, with flexion to 40 degrees and extension to 15 degrees. Tr. 316. He had diminished reflexes (rated one out of four) in his legs. Tr. 316.

In January 2020, Day saw Dr. DeMicco and had "some discomfort across the lumbar muscles" and limited range of motion, with flexion to 50 degrees and extension to 20 degrees. Tr. 315.

In early March 2020, Day saw Dr. DeMicco and had similar complaints and exam findings as his prior visit. Tr. 313. An MRI of Day's lumbar spine showed multilevel degenerative changes most pronounced at L5-S1. Tr. 286. Specifically, Day had a loss of signal and disc height at T12-L1 and L5-S1. Tr. 285. He had multilevel Schmorl's node deformities, a type of disc herniation. Tr. 285. Day had facet hypertrophy at L1 through L5 and ligamentum flavum thickening with mild neural foramen narrowing at L2 through L5. Tr. 285. At

7

L5-S1, Day had a disc bulge with an associated central disc protrusion and facet hypertrophy, causing moderate bilateral neural foramen. Tr. 285.

In late March 2020, Day returned to Dr. DeMicco and reported pain in his lower back and legs. Tr. 303. Day said that his lower back injection temporarily relieved his pain and he and Dr. DeMicco discussed Day returning to pain management for another injection. Tr. 303.

In early April 2020, Day saw Dr. Mikhail for lower back pain that was worse on the left side. Tr. 270. The pain radiated into Day's legs. Tr. 270. Day rated his pain an eight out of ten. Tr. 270. When his pain was present it interfered with most daily activities. Tr. 270. Day's relevant exam findings were the same as his prior visit. Tr. 273–74. Dr. Mikhail planned to perform another lumbar injection. Tr. 274.

Three days later, Day went to the emergency room for left-sided lower back pain that he experienced upon waking up that morning. Tr. 299. Gabapentin had not relieved his pain. Tr. 299. Upon exam, Day had left-sided, lumber paraspinal tenderness exacerbated by palpation and range of motion. Tr. 300. Day was treated with Toradol and Norflex and felt "much better." Tr. 301.

In late April 2020, Day had a telemedicine visit with Dr. DeMicco and reported going to the emergency room with back pain "so severe, he could not move." Tr. 298. Dr. DeMicco continued Day's gabapentin. Tr. 298.

In mid-May 2020, Day saw Dr. Mikhail and had similar exam findings as Day's prior visit. Tr. 278–79. About two weeks later, Dr. Mikhail provided Day with a lumbar epidural steroid injection. Tr. 290. That same day, Dr. Mikhail drafted a letter in connection with Day's work injury from 2012. Tr. 282. Dr. Mikhail described Day's statements about Day's pain and reproduced Day's exam findings from April 2020. Tr. 282–84. Dr. Mikhail concluded that Day's "objective and subjective findings and attached radiographic evidence clearly indicates lumbosacral spondylosis without myelopathy or radiculopathy at L5-S1." Tr. 282–84. Dr. Mikhail expressed his disagreement with another doctor's findings that Day's symptoms were not related to Day's work injury and "highly recommend[ed] the approval of this additional allowance to help treat [Day]." Tr. 284.

In June 2020, Day saw Dr. DeMicco and reported that he still worked at Walmart and "d[id] a fair amount of" bending, twisting, lifting, and standing on his feet for long periods of time. Tr. 281. He was taking gabapentin for pain and stopped taking diclofenac at Dr. Mikhail's direction. Tr. 281. Day was supposed to have a second injection a week before that day's visit with Dr. DeMicco but Day had to cancel because he was sick. Tr. 281. Upon exam, Day had pain across his lumbar muscle, "flattening and some spasm," and decreased reflexes in his legs. Tr. 281. Dr. DeMicco continued Day's gabapentin. Tr. 281.

In August 2020, Day saw Dr. DeMicco. Tr. 445. Day said that he was having difficulty at work because of his back pain, he thought he was going to get fired, and so he quit shortly after his last visit with Dr. DeMicco. Tr. 445. Day complained of pain in his legs and reported having trouble sitting and standing "for even short periods of time." Tr. 445. Dr. DeMicco's lumbar exam findings showed that Day had pain "across the lumbar muscle" and "some flattening." Tr. 445. Day had a limited range of motion with flexion to 40 degrees and extension to 15 degrees and guarding with straight leg raise testing. Tr. 445. Dr. DeMicco continued Day's gabapentin and requested a consultation with an orthopedic spine surgeon. Tr. 445. In September, Day saw Dr. DeMicco and had pain over his "lumbar midline and lumbar muscle" and pain with straight leg raise testing at 40 degrees of hip flexion. Tr. 444. Day had a limited range of motion with flexion to 45 degrees, extension to 15 degrees, and side bending 10 to 15 degrees. Tr. 444.

In October 2020, Day had a consultative exam with Brandon Arehart, D.O. Tr. 428–30. Day reported back pain "on and off since 2012," worse on the left side, and some radiculopathy down his left leg. Tr. 428. Day said that due to back pain, he could only stand, sit, or lie down for two to three hours at a time without having to move. Tr. 428. He occasionally drove a car but it was uncomfortable due to his back pain. Tr. 428. He had no difficulty navigating stairs at home. Tr. 428. Dr. Arehart's exam findings showed that Day had an antalgic gait and "taut and tender" lumbar paraspinal muscles. Tr. 429. He

had intact cranial nerves and full or four-out-of-five strength throughout his arms and legs. Tr. 431. Day had decreased range of motion in his lumbar spine. Tr. 433. He was able to transition from a chair to a table without difficulty. Tr. 432. Dr. Arehart opined that Day can perform "light duty work given his condition at this time, likely only able to stand a couple hours a day intermittently and without breaks." Tr. 430. Day could lift less than 20 pounds intermittently and not consecutively or constantly. Tr. 430.

A week later, Day followed up with Dr. DeMicco. Tr. 442. Day was taking Neurontin and Robaxin for pain. Tr. 442. Upon exam, Day had a flattening of his lumber curve and pain upon palpation of his lumber muscles. Tr. 442. He had a decreased range of motion, with flexion at 40 to 45 degrees and extension at 10 to 15 degrees. Tr. 442. Day had decreased reflexes in his legs. Tr. 442. Dr. DeMicco continued Day's medications. Tr. 442.

In November 2022, Day saw Dr. DeMicco. Tr. 441. Dr. MeMicco wrote that he reviewed the note from the spine surgeon, who "d[id] not believe that [Day] [wa]s a surgical candidate," although the surgeon "mention[ed] that [Day's] herniated disc at L5-S1 is now a degenerative disc." Tr. 441. The spine surgeon had recommended pain management with Dr. Mikhail "for possible injections." Tr. 441. Day told Dr. DeMicco that he "want[ed] to be treated conservatively at this point in time." Tr. 441. Upon lumbar exam, Day had a flattening of his lumbar curve and he could flex to 40 degrees and extend to 15 degrees. Tr. 441. He had decreased reflexes in his legs and pain with straight

leg raise testing at 40 degrees of hip flexion. Tr. 441. Dr. DeMicco continued Day's medications. Tr. 441.

In December 2020, Day saw Dr. DeMicco and his exam showed a flattening of the lumbar lordosis, decreased range of motion with flexion and extension, and decreased reflexes, one-out-of-four, in his legs. Tr. 440. In January 2021, Day could flex his lumbar spine to 40 degrees and extend to 15 degrees. Tr. 439. He had guarding with straight leg raise testing at 40 degrees of hip flexion. Tr. 439.

In February 2021, Day told Dr. DeMicco that his back pain was getting worse. Tr. 438. His leg pain was worse in his right leg. Tr. 438. He was taking Neurontin for pain. Tr. 438. Dr. DeMicco commented that Day walked around the room with "some difficulty." Tr. 438. Day's exam showed that Day had pain across his lumbar muscles, spasm, and flexion to 40 degrees and extension to 10 degrees. Tr. 438. He had pain with straight leg raise testing and reflexes were decreased, one-out-of-four, in his legs. Tr. 438. Dr. DeMicco referred Day for a pain management consultation with Dr. Mikhail for possible injections. Tr. 438. Dr. DeMicco discussed with Day the benefit of a home stretching program and continued Day's Neurontin. Tr. 438.

In March 2021, Day saw Dr. DeMicco and reported pain in his neck and "down both of his legs." Tr. 437. Upon lumbar exam, Day had pain across his lumbar muscles, "some mild spasm," and flexion to 50 degrees and extension to 20 degrees. Tr. 437. He had decreased reflexes, one-out-of-four, in his legs.

12

Tr. 437. In April, Day had pain across his lumbar muscles and a flattening of his lumbar curve. Tr. 436. He had lumbar flexion to 45 degrees, extension to 15 degrees, and side bending to 15 degrees. Tr. 436. Day had decreased reflexes, one-out-of-four, in his legs. Tr. 436. Dr. DeMicco refilled Day's Neurontin and discussed the benefit of a home stretching program. Tr. 436.

3.    *State agency opinions*[8]

In October 2020, Dana Schultz, M.D., reviewed Day's record and assessed Day's residual functional capacity (RFC).[9] Tr. 54–55. Dr. Schultz found that Day could lift, carry, and pull 20 pounds occasionally and 10 pounds frequently. Tr. 54. He could stand and walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. Tr. 54. Day could never climb ladders, ropes, or scaffolds and could occasionally climb

---

[8]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

ramps and stairs. Tr. 54. He could frequently stoop, balance, kneel, crouch, and crawl and must avoid exposure to hazards. Tr. 54–55.

In February 2021, W. Scott Bolz, M.D., adopted Dr. Schultz's findings. Tr. 63–64.

### 4. *Hearing testimony*

Day, who was represented by counsel, testified at the telephonic administrative hearing. Day stated that he has a lot of lower back pain. Tr. 37. He rated his pain on a typical day as an eight out of ten. Tr. 37. When asked if his symptoms were improving, staying the same, or getting worse, Day answered that "it's gotten a little better, not a whole lot." Tr. 37. He takes medications as prescribed and has no side effects. Tr. 37. Day has a driver's license and can drive the five-minute drive into town. Tr. 41. He can't drive for long periods of time. Tr. 41.

Day said that he could probably walk for ten minutes. Tr. 37. He doesn't go to stores because pain limited his ability to walk. Tr. 37. Day estimated that he could at most lift less than ten pounds. Tr. 38. He could sit for about 30 to 45 minutes, but then he has to lie down for 15 to 20 minutes because his legs go numb. Tr. 40. Day doesn't use ice, heat, or a TENS unit to relieve pain. Tr. 40. He uses a cane for support when he walks and when he stands "for a prolonged … time." Tr. 41. Day agreed that he has "issues" rising from a seated position and bending and stooping. Tr. 41. He can bend and stoop to pick something up off the ground but "it starts to pinch." Tr. 41.

14

Day described a typical day: he lies in bed for about 30 minutes to an hour and then moves to the couch for 30 to 45 minutes. Tr. 38. After that, Day goes back to the bed. Tr. 38. The only time he leaves his house is for doctors' appointments. Tr. 38–39. Day used to love to sit and play video games but he can't really do that anymore. Tr. 39. He used to love working on cars but he doesn't do that anymore. Tr. 39. Day lives with his wife and two teenaged sons and his sons do yardwork and help around the house. Tr. 39. Day's wife helps Day cook, get dressed, and shower. Tr. 39. Day uses a shower chair. Tr. 41.

Day had a back injection that "seemed like it helped out a little bit." Tr. 42. When asked if Day's doctor recommended anything that Day could do to help with his issues, like surgery, Day answered, "No. They said surgery is bad." Tr. 42. He explained, "The doctor not—rather have to deal with [it] for the rest of my life." Tr. 42.

The ALJ discussed with the vocational expert Day's past relevant work as a material handler. Tr. 43. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Day could perform Day's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 43–46. The vocational expert answered that such an individual could not perform Day's past work but could perform the following jobs in the national economy: inspector, bench assembler, and packager. Tr. 45.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since June 6, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: degenerative disc disease, hypertension, and depression (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he must change from sitting to standing or standing to sitting once every 90 minutes for two to three minutes at a time. He must use a cane for ambulation. He can never climb ladders, ropes, or scaffolds but he can occasionally climb ramps and stairs. The claimant can frequently balance, stoop, kneel, crouch, and crawl. He can never work at unprotected heights, never work around moving mechanical parts, and can do no commercial driving. He is able to perform simple, routine, and repetitive tasks but not at a production rate pace.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born [i]n … 1976 and was 44 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The

claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 6, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–24.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1.     Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2.     Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3.     Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4.     What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5.     Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each

18

element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id*.

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*,

800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

Day argues that the ALJ failed to properly consider Day's symptoms. Doc. 10, at 13. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)). The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent

20

reviewer can assess how the adjudicator evaluated the individual's symptoms."
Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

Day objects to this paragraph from the ALJ's decision:

> With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. The record showed that the claimant had ongoing low back pain going into his legs intermittently. Although he had decreased motion and reflexes, his condition was generally stable during the relevant period. The claimant required only conservative treatment with medications and one injection. Such facts suggest that he could perform the reduced range of sedentary work described in the residual functional capacity.

Tr. 22; Doc. 10, at 14. Day alleges that, in that passage, the ALJ "misses the mark and mischaracterizes the evidence." *Id*.

First, Day takes issue with the ALJ's finding that Day's condition was "generally stable." *Id*. In his decision, the ALJ discussed Day's allegations about Day's limitations. Tr. 20. The ALJ remarked that Day had a history of lumbar disc degeneration and herniation before his alleged onset date of June 2020. Tr. 20. The ALJ wrote that in April 2020, Day reported lower back pain radiating into his legs. Tr. 20. Day had lumbar spine tenderness, decreased leg strength, an antalgic gait, and normal reflexes and sensation. Tr. 20. Day's lumbar MRI showed multilevel degenerative changes, most pronounced at L5-S1. Tr. 20. The ALJ commented that in May 2020, Day had similar exam findings; was advised to continue physical therapy and his medications; and received a lumbar epidural steroid injection. Tr. 20.

The ALJ wrote that in June 2020, Day was still working full-time and was bending, twisting, lifting, and standing on his feet for long periods. Tr. 20. Day had pain and spasms across his lumbar muscles and decreased reflexes in his legs. Tr. 20. Day's doctor prescribed Neurontin. Tr. 20. The ALJ remarked that in August 2020, Day told his doctor that he quit his job because he had trouble performing his job duties due to back pain. Tr. 20. That day, Day had "pain across his lumbar muscle, some flattening, and limited motion with guarding on straight leg raising bilaterally." Tr. 20. Day continued taking Neurontin and Day's doctor requested a surgical consultation. Tr. 20. In September 2020, Day had similar exam findings as before. Tr. 20.

The ALJ explained that Day had a follow-up appointment in October 2020 and that his "lumbar spine findings were stable with decreased motion and lower extremity reflexes." Tr. 21. Day was taking Neurontin and Robaxin. Tr. 21. "Later that month, an orthopedic surgeon said that he did not believe [Day] was a surgery candidate and he should seek pain management with possible injections." Tr. 21. The ALJ observed that Day's "exam findings and treatment remained stable through early 2021 with mild spasms and pain going down both legs." Tr. 21. And in April 2021, Day reported intermittent leg pain and said that he avoided heavy lifting and repetitive bending and twisting at the waist. Tr. 21. His exam that day showed pain across his lumbar spine, flattening of the lumbar curve, and reduced range of motion and reflexes in his legs. Tr. 21. The ALJ wrote that Day continued taking Neurontin. Tr. 21.

22

Day argues that his "baseline of pain was consistently at a rather extreme range of pain, and he was never stable in the sense his pain was relieved." Doc. 10, at 14. But the ALJ didn't say that Day's pain was relieved. Indeed, the ALJ partially credited Day's alleged symptoms and limitations. Tr. 22. The ALJ detailed Day's imaging, exam findings, and treatment and characterized Day's "condition" as "generally stable during the relevant period." Tr. 22. Day doesn't find fault with the ALJ recitation of the record, described above, which shows that Day's exam findings were what one could reasonably call "generally stable." Instead, Day only points to evidence in the record that he believes supports his assertion that his "pain was actually worsening." Doc. 10, at 14. Day cites some of his visits with Dr. DeMicco and Dr. Mikhail in which Day reported that his pain was getting worse, and Day's emergency room visit for back pain in April 2020, two months before Day's alleged onset date. *Id*. at 14–15. But at times the longitudinal record also shows that Day reported less, not more, pain. *See, e.g.*, Tr. 263 (Day's August 2019 visit with Dr. Mikhail in which Day rated his pain an eight out of ten); Tr. 317 (Day's November 2019 visit to Dr. DeMicco in which Day rated his pain a six out of ten). And by April 2021, Day was only taking one medication— Neurontin—as the ALJ observed. Tr. 21, 436–38. Day hasn't shown that the ALJ's characterization of his lumber condition as "generally stable" is inaccurate.

Next, Day challenges the ALJ's assertion that Day "required only conservative treatment with medications and one injection." Doc. 10, at 15. Day argues that he had two injections, not one. *Id*. Nevertheless, that fact doesn't mean that the ALJ's characterization of Day's treatment as *conservative* was faulty. In fact, the record supports the ALJ finding that Day regularly received only medication for treatment. *See, e.g.*, Tr. 281, 298, 303, 315, 324, 337, 381, 436–38, 441, 442. And Day told Dr. DeMicco that "he just wants to be treated conservatively." Tr. 324 (October 2019), 441 (November 2020). Day suggests that he was not a surgical candidate because "possibly … it would worsen him," Doc. 10, at 16, but points to no evidence showing that a surgeon or any other provider said that Day shouldn't have surgery because it would make his condition worse. Instead, Day was told that he was not a "surgical candidate" and the surgeon recommended pain management for "possible injections." Tr. 441.

Day does not show that the ALJ's explanation for finding *partially consistent* Day's statements about Day's alleged symptoms and limitations was improper, *see* 20 C.F.R. § 404.1529(c)(3), or a mischaracterization of the evidence.

Day submits that there are objective exam findings in the record that support Day's allegations of symptoms. Doc. 10, at 16 (citing exam findings of decreased range of motion, strength, and reflexes; pain upon palpation; spasms; positive straight leg raise testing; and a flattening of the lumbar

curve); *see also* Doc. 13, at 2–3. But the ALJ acknowledged all those findings. Tr. 20–22. Day's assertion that the ALJ should have given more weight to Day's symptoms is more a request that the Court reweigh the evidence, which the Court cannot do. *See Garner*, 745 F.2d at 387.

In his reply brief, Day argues that it wasn't Day's fault that he didn't receive more lumbar injections and that, in fact, "more were recommended." Doc. 13, at 2. But Day doesn't dispute that he was primarily treated with medication, so the ALJ's statement that Day required conservative treatment is not inaccurate. Day emphasizes that he was not deemed to be a "surgical candidate *at this point in time*," *id.*, but doesn't explain how that fact means that the ALJ erred. If anything, the fact that Day's condition wasn't yet severe enough to warrant a surgical procedure supports the ALJ's finding that Day's lumbar condition during the relevant period was stable and not disabling.

Also in his reply brief, Day takes issue with arguments that the Commissioner made in her brief about Day's activities of daily living and the ALJ's reliance upon the opinion evidence. Doc. 13, at 3–4. But this Court reviews the ALJ's decision for error, not the Commissioner's brief. Day doesn't challenge the ALJ's decision as to Day's activities of daily living. He doesn't challenge the ALJ's decision as to the opinion evidence, other than making the following observation: the consultative examiner, Dr. Arehart, said that Day could perform "light duty work" but also opined that Day could perform less than light work. Doc. 13, at 4. But the ALJ acknowledged that Dr. Arehart's

limitations generally amounted to sedentary work. Tr. 22. And the ALJ limited Day to performing sedentary work with additional limitations. Tr. 19.

Days doesn't show that the ALJ erred, so the Court should affirm the ALJ's decision.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 12, 2023

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).